ILND 44 (Rev. 08/23)

# CIVIL COVER SHEET

The ILND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(See instructions on next page of this form.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff
*(Except in U.S. plaintiff cases)*

County of Residence of First Listed Defendant
*(In U.S. plaintiff cases only)*
Note: In land condemnation cases, use the location of the tract of land involved.

**(c)** Attorneys *(firm name, address, and telephone number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Check one box, only.)*

- ☐1 U.S. Government Plaintiff
- ☐3 Federal Question
  *(U.S. Government not a party.)*
- ☐2 U.S. Government Defendant
- ☐4 Diversity
  *(Indicate citizenship of parties in Item III.)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(For Diversity Cases Only.)*
*(Check one box, only for plaintiff and one box for defendant.)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated *or* Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated *and* Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV. NATURE OF SUIT *(Check one box, only.)*

| CONTRACT | TORTS | PRISONER PETITIONS | LABOR | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 510 Motions to Vacate Sentence | ☐ 710 Fair Labor Standards Act | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 530 General | ☐ 720 Labor/Management Relations | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury - Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **Other:** | ☐ 751 Family and Medical Leave Act | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 540 Mandamus & Other | ☐ 790 Other Labor Litigation | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine / ☐ 368 Asbestos Personal Injury Liability | ☐ 550 Civil Rights | ☐ 791 Employee Retirement Income Security Act | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loan (Excludes Veterans) | ☐ 345 Marine Product Liability | ☐ 555 Prison Condition | | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 560 Civil Detainee - Conditions of Confinement | | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | | | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury / ☐ 362 Personal Injury - Medical Malpractice | **PERSONAL PROPERTY** | **PROPERTY RIGHTS** | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 190 Other Contract | | ☐ 370 Other Fraud | ☐ 820 Copyright | |
| ☐ 195 Contract Product Liability | | ☐ 371 Truth in Lending | ☐ 830 Patent | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | ☐ 380 Other Personal Property Damage | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 850 Securities/Commodities/ Exchange |
| | | ☐ 385 Property Damage Product Liability | ☐ 840 Trademark | ☐ 890 Other Statutory Actions |
| | | | ☐ 880 Defend Trade Secrets Act of 2016 (DTSA) | ☐ 891 Agricultural Arts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **BANKRUPTCY** | **SOCIAL SECURITY** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 422 Appeal 28 USC 158 | ☐ 861 HIA (1395ff) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 423 Withdrawal 28 USC 157 | ☐ 862 Black Lung (923) | |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/Accommodations | | ☐ 864 SSID Title XVI | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/ Disabilities- Employment | **IMMIGRATION** | ☐ 865 RSI (405(g)) | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 463 Habeas Corpus – Alien Detainee (Prisoner Petition) | **FEDERAL TAXES** | |
| | | ☐ 465 Other Immigration Actions | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| | | | ☐ 871 IRS—Third Party 26 USC 7609 | |

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

## V. ORIGIN *(Check one box, only.)*

- ☐1 Original Proceeding
- ☐2 Removed from State Court
- ☐3 Remanded from Appellate Court
- ☐4 Reinstated or Reopened
- ☐5 Transferred from Another District (specify)
- ☐6 Multidistrict Litigation - Transfer
- ☐8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION ( Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

## VII. PREVIOUS BANKRUPTCY MATTERS (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)

## VIII. REQUESTED IN COMPLAINT:
☐ Check if this is a **class action** under Rule 23, F.R.CV.P.

Demand $

CHECK Yes only if demanded in complaint:
Jury Demand: ☐ Yes   ☐ No

## IX. RELATED CASE(S) IF ANY *(See instructions):*
Judge                        Case Number

## X.  Is this a previously dismissed or remanded case? ☐ Yes  ☐ No   If yes, Case #          Name of Judge

Date: _____        Signature of Attorney of Record _____

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | | |
|---|---|---|---|
| BLAKE O'DELL, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| V. | ) | No. | |
| | ) | | |
| PETE HEGSETH, SECRETARY OF WAR; | ) | **JURY TRIAL DEMANDED** | |
| UNITED STATES DEPARTMENT OF | ) | | |
| WAR. | ) | | |
| | ) | | |
| Defendants. | ) | | |

## COMPLAINT AT LAW

NOW COMES Plaintiff, BLAKE O'DELL, by and through his attorneys, Henderson Banks Law, and for his Verified Complaint at Law, states as follows:

### JURISDICTION

1.      This is a suit in equity authorized and instituted pursuant to the Rehabilitation Act, as amended, 29 U.S.C.A. § 791 of the United States Code ("Act") for Defendant's unlawful employment discrimination against Plaintiff. Jurisdiction of this court is based upon a federal question, 28 U.S.C. § 1331. The Jurisdiction of this court is invoked to secure protection of and to address deprivation of rights secured by 29 U.S.C.A. § 791.

2.      Venue in this district is proper under 28 U.S.C. § 1391(b). The Defendant resides or resided in this district and the events giving rise to Plaintiff's claims occurred here.

3.      All conditions precedent to jurisdiction have occurred or been complied with, to-wit:

a.      A charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC"), by Plaintiff BLAKE O'DELL ("Plaintiff"), on May 4, 2023, a copy of which is attached hereto as **Exhibit 1.**

1

b.    The EEOC issued a Notice of Dismissal of Plaintiff's charge of discrimination on September 12, 2024, a copy of which is attached hereto as **Exhibit 2**.

c.    Plaintiff filed an appeal with the EEOC on September 6, 2024, a copy of which is attached hereto as **Exhibit 3**.

d.    The EEOC affirmed the dismissal of Plaintiff's charge of discrimination on appeal, on September 16, 2025, a copy of which is attached hereto as **Exhibit 4**.

e.    The September 16, 2025 decision included a notice of right to sue within 90 days, and Plaintiff filed this action within 90 days of receipt thereof.

## PARTIES

4.    Plaintiff, BLAKE O'DELL ("Plaintiff") is a citizen of the United States and the State of Illinois and resides in Illinois.

5.    Plaintiff was, at all times relevant, employed by the Defendant, the UNITED STATES DEPARTMENT OF WAR ("Defendant"). At the time of the events which gave rise to this action, Defendant was known as the Department of Defense. Any reference to the Department of Defense or DoD is a reference to Defendant.

6.    Defendant is a United States Federal Agency doing business in Illinois.

## FACTS

**Plaintiff's Disability**

7.    Plaintiff was diagnosed with Asperger's Syndrome on or about DATE. In connection with this diagnosis, Plaintiff suffers from deficiencies in social skills, communication, and learning new information.

8.    Plaintiff's Asperger's Syndrome was a "disability" as defined by 29 U.S.C. § 705(20) of the Act, as the condition is a mental impairment which results in a substantial

2

impediment to employment, and can benefit in terms of an employment outcome from vocational rehabilitation services provided pursuant to the Act.

**Plaintiff Begins His Employment With Defendant**

9.　　Plaintiff began his employment with the Chicago Military Entrance Processing Station ("MEPS"), in Chicago, Illinois, on or about October 11, 2022. MEPS is a joint service, co-owned by the Department of Defense.

10.　　Plaintiff began working as a Processing Technician at MEPS. This was a competitive service position which allowed applicants eligible under Schedule A to apply.

11.　　Schedule A is a special hiring authority that federal agencies may use to hire individuals with disabilities, pursuant to 5 CFR §213.3102(u).

12.　　Plaintiff applied, and was hired for, the position of Processing Technician through Schedule A and provided proof of his disability.

13.　　Plaintiff was certified under Schedule A that, even with his disability, he was fit for Federal employment.

14.　　At all times, Plaintiff performed his job duties to the reasonable expectations of Defendant.

**Defendant's Performance and Management Appraisal Procedures**

15.　　Chapter 43 of title 5, United States Code provides for the establishment of agency performance appraisal systems. 5 CFR Part 430, Subpart B provides for the performance appraisal of general schedule and prevailing rate employees.

16.　　Department of Defense Civilian Personnel Management System: Performance Management and Appraisal Program ("DPMAP"), as set forth in DoD Instruction 1400.25 Volume 431, was implemented in accordance with Pursuant to Chapter 43 of title 5, U.S.C., and the applicable regulations.

17.     At all times relevant, DPMAP applied to Plaintiff in his position as Processing Technician.

18.     The purpose of DPMAP was to "[p]rovide a fair, credible, and transparent performance appraisal program for linking bonuses and other performance-based actions to employee performance…" DoDI 1400.25-V431, February 4, 2016 Change 3, January 10, 2022.

19.     Defendant was required to follow the requirements of DPMAP in supervising and appraising Plaintiff during his employment with Defendant.

20.     DPMAP Section 3.3 required Defendant to establish a written Employee Performance Plan ("Performance Plan") for Plaintiff.

21.     A Performance Plan must be established and approved for each employee, normally within 30 calendar days of the beginning of the employee's assignment to a new position.

22.     A Performance Plan includes an employee's Performance Elements and Performance Standards.

23.     Performance Elements describe the expectations related to the employee's work. All performance elements must be "critical elements", which are work assignments or responsibilities of such importance that unacceptable performance would result in a determination that the employee's overall performance is unacceptable.

24.     Performance Standards describe how the requirements and expectations provided in the Performance Elements are to be evaluated. Performance Standards must be provided for each Performance Element, and should include specific, measurable, achievable, relevant, and timely criteria, for developing effective results and expectations.

25.     Supervisors must communicate approved Performance Plans to employees.

26.     DPMAP Section 3.4 required Defendant to continuously monitor employee performance throughout the appraisal cycle, in order to provide timely feedback regarding whether

an employee is meeting expectations. Supervisors are obliged to initiate discussions with employees regarding their work performance, as well as documented progress reviews.

27. DPMAP Section 3.9a provided that supervisors who detect a decline in an employee's performance should clearly communicate to the employee that their performance fails to meet the Performance Standards provided in their Performance Plan, as well as guidance as to what is needed for the employee to improve.

**Defendant Fails to Adequately Train Plaintiff**

28. Defendant and Plaintiff's supervisors knew or should have known that Plaintiff was disabled, as he was hired under Schedule A. When he was hired, Plaintiff also informed management that he was slower to learn new information.

29. Processing Technicians are involved in processing enlisting applicants into the Armed Forces. The essential functions included obtaining required information from applicants, administering pre-oath briefings to applicants, and data entry using the United States Military Entrance Processing Command Integrated Resource System 1.1 ("USMIRS 1.1" or "MIRS 1.1").

30. Defendant did not provide Plaintiff with a complete Performance Plan. The only Performance Elements listed were front desk duties, data entry, file room/packet breakdown, and expectations/leave. MIRS 1.1 was not included as a Performance Element. None of the Performance Elements included Performance Standards.

31. For the first 90 days of Plaintiff's employment with Defendant, from October 2022 through the middle of January 2023, he simply scanned documents and records. Plaintiff received

5

no specialized training for the position of Processing Technician during this time. Management staff rarely spoke to Plaintiff or even acknowledged his presence.

32.     As a result, Plaintiff learned little about the actual requirements of his position for the first three months of employment.

**Plaintiff Requests an Accommodation**

33.     In November of 2022, Plaintiff requested a recording device as a reasonable accommodation to help him learn the duties of his position. The recording device arrived in late January, 2023, three months later.

34.     During this time, Plaintiff was supervised by Human Resource Associates Thomas Burke and Jonathan Woods, Commander Thomas Cho, and Jt. J.G. Addisen Rutkoske.

35.     Plaintiff's Supervisors knew or should have known that Plaintiff was a Schedule A employee, that he was disabled, and that he was slow to learn new information.

36.     As a result of Plaintiff's disability and slow learning, he would often ask questions about his job duties. Plaintiff also asked questions due to his lack of training for the first three months of employment with Defendant.

37.     Burke would often react with annoyance whenever Plaintiff asked questions. Burke would also react with annoyance if Plaintiff made a mistake for not asking questions.

38.     Burke would make demeaning comments in response to Plaintiff's questions, such as "You've been here for four months now you should know that." This was despite the fact that Plaintiff had spent the first three months simply scanning documents, without being properly trained in other areas.

39.     Burke and other Human Resource Associates also reacted with annoyance to Plaintiff using his recording device as an accommodation to learning and asking questions about his position. Only Woods did not mind Plaintiff using the recording device.

40. On or about February 15, 2023, Rutkoske sent an email to Patricial Chaplin asking for a performance evaluation and protection from Plaintiff's reasonable accommodation recorder.

41. Burke, Cho, and other supervisors' conduct discouraged Plaintiff from asking questions, discouraged him from using his recording device as an effective accommodation, and made it impossible for Plaintiff to effectively learn the duties of his position.

**Defendant's Failure to Train Plaintiff Causes Errors**

42. On February 14, 2023, Plaintiff was given his first opportunity to administer pre-oath briefings to enlisted applicants. Plaintiff was supervised by Woods.

43. On that date, Plaintiff played an introductory video to the applicants while Woods handed out "pre-accession" interview sheets for the applicants to complete. When the video was completed and Plaintiff was about to send the applicants into the ceremony room, Woods intervened because he noticed that Plaintiff had not collected and verified the interview sheets.

44. This error occurred because Plaintiff was not previously trained on the specific procedures for administering pre-oath briefings and pre-accession interview sheets.

45. These details were not included in a Performance Plan for Plaintiff.

46. Wood also could have prevented the error earlier when he noticed that Plaintiff had started the video while Woods was handing out the sheets.

47. Once Woods and/or Burke informed Plaintiff of the error, Plaintiff collected and verified the interview sheets. Plaintiff never repeated this error.

48. On February 21, 2023, Plaintiff was responsible for confirming all applicants departing from MEPS Chicago in MIRS 1.1.

49. On that date, two applicants were erroneously confirmed in MIRS 1.1 as shipped to basic training. Both applicants had not completed drug tests and were not authorized to ship.

7

50.     Plaintiff had not been fully trained in using MIRS 1.1 and was only instructed to place a check mark in the box when the applicants had been shipped to basic training. Plaintiff did not have a reason to know that the applicants had not completed drug tests, or that MIRS 1.1 system would allow him to confirm an applicant that had not completed drug tests.

51.     Plaintiff was completely unaware that this error occurred and was never informed that it occurred prior to his termination.

**Defendants Weekly Meetings with Plaintiff**

52.     Rutkoske began conducting New Hire Weekly Meetings with Plaintiff in February of 2023, just one week after Plaintiff obtained his recording device accommodation.

53.     In the absence of a proper Performance Plan, and a lack of training for three months, Plaintiff used the weekly meetings as part of his on-the-job training. Plaintiff relied upon these meetings for guidance on how to improve.

54.     Defendant, however, used these meetings to mischaracterize Plaintiff's on-the-job training as examples of how he was not able to perform his job.

55.     Defendant conducted four meetings in total with Plaintiff: February 8, 2023, February 15, 2023, February 22, 2023, and March 2, 2023.

56.     MIRS 1.1 was not on any of the New Hire Weekly Meeting memorandums.

8

57. At none of these meetings did Defendant clearly communicate to Plaintiff that his performance failed to meet the Performance Standards provided in his Performance Plan.

58. Defendant did not raise either the February 14, 2024 incident or the February 21, 2023 incident at any of the weekly meetings.

59. At none of these meetings did Defendant inform Plaintiff that he risked termination, let alone termination as a result of the December 14 or December 21 incidents.

60. As such, these meetings did not comply with DPMAP Section 3.4, which required Defendant to provide timely feedback regarding whether an employee is meeting expectations.

61. Nor did these meetings comply with DPMAP Section 3.9a, which required supervisors who detect a decline in an employee's performance to clearly communicate to the employee that their performance fails to meet their Performance Standards, and to provide guidance.

62. Despite Defendant's motive in implementing these meetings, Plaintiff was responsive to the areas of improvement that were identified in the weekly meetings. By the March 2, 2023 meeting, Rutkoske noted that Plaintiff had improved in seven of the eight areas, and was praising Plaintiff for his improvement.

**Plaintiff is Terminated**

63. On March 8, 2023, Defendant terminated Plaintiff's employment. Cho notified Plaintiff of his termination via letter.

9

64.     The termination letter stated that Plaintiff was being terminated for the February 14, 2023 pre-accession sheet incident and the February 21, 2023 erroneously confirmed applicant incident.

65.     This was the first time that Plaintiff had heard about the February 14, 2023 incident since it had occurred. Plaintiff was surprised that this was grounds for termination as he had fixed the error the day that it occurred, never repeated the error, and was never subsequently reprimanded for it at any of his weekly meetings.

66.     The termination letter falsely stated that Plaintiff was trained on six separate occasions on the interview sheet verification task. Plaintiff was not trained prior to the February 14, 2023 incident, and was only informed of the proper procedures after the error was made.

67.     March 8, 2023 was the first time that Plaintiff was ever informed about the error that occurred on February 21, 2023. Plaintiff had continued to use the MIRS 1.1 system for the two weeks afterwards, without incident. Cho read the termination letter word for word and this was the first time he learned that he made a mistake in the MIRS 1.1 System.

68.     Neither of the procedures at issue in the February 14 and 21 incidents were addressed in a Performance Plan, either as Performance Elements, or articulated as Performance Standards.

69.     Cho also cited the memorandums from the February 8, 15, and 22 weekly meetings as justification for termination. This was despite the fact that Plaintiff had substantially improved on these areas by March 2, 2023, as discussed in that meeting's memorandum.

## COUNT I
## EMPLOYMENT DISCRIMINATION BASED UPON DISABILITY IN VIOLATION OF 29 U.S.C. § 794(a) – DISPARATE TREATMENT

70.     Plaintiff incorporates and realleges paragraphs 1-69 as though fully stated herein.

71.     Section 794(a) of the Rehabilitation Act provides that:

"No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency…"

29 U.S.C. § 794(a)

72.     Plaintiff was a qualified individual with a disability under the Act. He was able to perform the essential functions of Processing Technician, with or without a reasonable accommodation, to wit: a recording device.

73.     Defendant was an Executive Agency under the Act.

74.     Plaintiff's employment by Defendant as a Processing Technician, as a Schedule A employee, was a program or activity as defined by the Act.

75.     The Act, through its incorporation of 42 U.S.C.A. § 12112 of the Americans with Disabilities Act, prohibits disparate treatment of a qualified individual on the basis of disability.

76.     Defendant, through its employees who supervised and managed Plaintiff, knew or should have known that Plaintiff was diagnosed with Asperger's Syndrome and was slow at learning new information.

77.     Throughout Plaintiff's employment, Defendant's supervisors and managers of Plaintiff demonstrated their unwillingness to provide even basic training to Plaintiff in the essential functions of his position.

78.     Specifically, Defendant caused Plaintiff to suffer the following adverse employment actions:

11

a.  Failing to provide Plaintiff with a complete Performance Plan, which included the essential functions of the position of Processing Technician as Performance Elements and Performance Standards. Defendant was required to do this for all employees pursuant to its own internal policies and procedures;

b.  Neglecting Plaintiff's training and ignoring him for 90 days;

c.  Responding with annoyance, impatience, and disdain when Plaintiff asked questions about how to perform the essential functions of his position, and discouraging him from asking questions;

d.  Responding with annoyance, impatience, and disdain when Plaintiff attempted to use his reasonable accommodation (recording device) to assist in learning the essential functions of his position, which discouraged and stigmatized him from using his accommodation;

e.  Failing to provide Plaintiff with timely feedback regarding his performance, both in and out of weekly meetings, as required by Defendant's own policies and procedures;

f.  Failing to fully train Plaintiff on the procedures for administering pre-oath briefings and pre-accession interview sheets;

g.  Failing to fully train Plaintiff on the use of MIRS 1.1;

h.  Blaming Plaintiff for errors that occurred due to Defendant's failure to train Plaintiff;

i.  Failing to clearly communicate to the Plaintiff that his performance was allegedly failing to meet Performance Standards, as required by Defendant's own policies and procedures;

j.   Knowingly concealing Plaintiff's alleged errors regarding the February 21, 2023 incident; and,

k.   And other similar conduct as described in the foregoing paragraphs.

79.   Defendant engaged in the above adverse employment actions because of Plaintiff's disability. Plaintiff's supervisors and managers neglected training and communicating with Plaintiff because they simply did not want to interact with a person with Asperger's Syndrome. This was demonstrated by their disdain, impatience, and annoyance in communicating with Plaintiff and answering his questions. Defendant did not care to follow its own procedures and invest even the most basic level of effort in training Plaintiff to ensure that he succeeded.

80.   Upon information and belief, Defendant did not treat similarly situated employees who lacked Plaintiff's disability with the same level of neglect, impatience, and disdain. This is evinced in part by the fact that Defendant failed to follow the DPMAP procedures, which are supposed to apply to all employees. Upon information and belief, Defendant followed its own procedures to properly train and provide feedback to similarly situated employees who did not have Asperger's Syndrome.

81.   Plaintiff was always able to perform the essential functions of the position of Processing Technician, with or without his reasonable accommodation, when Defendant actually provided training and feedback. When informed of the pre-accession sheet error on February 14, 2023, Plaintiff immediately corrected the error and never made the same mistake again. And for those areas of improvement that Defendant did disclose to Plaintiff during the weekly meetings, Plaintiff was already showing marked improvement by the March 2, 2023 meeting.

82.   As a result of Defendant's above adverse employment actions, Plaintiff never received the same level of training and feedback as similarly situated employees who did not have Asperger's Syndrome, and was never fully trained in the essential functions of his position.

13

Defendant then turned around and criticized Plaintiff for his lack of training in the last month of his employment, blamed him for errors that occurred because of Defendant's own failure to train him, and ultimately terminated him.

83.     Defendant's adverse employment actions against Plaintiff were thus discrimination against a qualified individual on the basis of their actual or perceived disability, in violation of the Act.

84.     In committing the above adverse employment actions against Plaintiff, Defendant maliciously and/or recklessly violated the Act.

85.     Plaintiff demands trial by jury.

## COUNT II
## EMPLOYMENT DISCRIMINATION BASED UPON DISABILITY IN VIOLATION OF 29 U.S.C. § 794(a) – FAILURE TO ACCOMMODATE

86.     Plaintiff incorporates and realleges paragraphs 1-85 as though fully stated herein.

87.     The Act, through its incorporation of 42 U.S.C.A. § 12112 of the Americans with Disabilities Act, requires Agency employers to make reasonable accommodations for the known physical or mental limitations of a qualified individual on the basis of disability.

88.     One of the mental impairments resulting from Plaintiff's disability of Asperger's Syndrome is difficulty in communicating and slowness in learning new information.

14

89. Defendant knew or should have known of Plaintiff's impairments when it hired him as a Schedule A employee, as the Schedule A application included Plaintiff's diagnoses.

90. Plaintiff also specifically informed management that he was slow to learn new information.

91. As an accommodation for his impairment, Plaintiff requested a recording device.

92. The recording device was a reasonable accommodation that allowed Plaintiff to more easily learn and retain new information about the essential functions of his position.

93. Although Defendant provided Plaintiff with the recording device, Defendant supervisors failed to cooperate with Plaintiff using his accommodation. Plaintiff's supervisors and/or HRAs reacted with annoyance when he used the device, and thus discouraged Plaintiff from actually using his accommodation.

94. Plaintiff informed Rutkoske that the lead Human Resource Associates were frustrated with him for using his recording device. Rutkoske responded that she would talk with the Human Resource Associates about the issue. Plaintiff did not know if Rutkoske did in fact talk with them. In any event, the Human Resource Associates' attitudes towards Plaintiff using the recording device did not improve.

95. After Plaintiff requested and obtained the recording device, Defendant began more harshly scrutinizing Plaintiff's work performance through weekly meetings meant to document Plaintiff's alleged failings.

15

Upon information and belief, Defendant began scrutinizing Plaintiff's conduct in response to his requesting and attempting to use the recording device.

96.     Upon information and belief, it was Plaintiff's request for and use of the recording device that contributed to Defendant's decision to ultimately terminate him.

97.     Plaintiff's use of the recording device did not impose an undue hardship on Defendant's operations. Plaintiff's supervisors' resistance to allowing Plaintiff to use his recording device was not reasonable, but was due to the discriminatory bias that they had consistently demonstrated towards Plaintiff, and their unwillingness to make reasonable accommodations for Plaintiff's use of the recording device..

98.     Defendant's conduct thus amounted to a failure to reasonably accommodate Plaintiff's disability, and constituted discrimination against a qualified individual on the basis of her actual or perceived disability, in violation of the Act.

99.     In failing to accommodate Plaintiff, Defendant maliciously and/or recklessly violated the Act.

100.     Plaintiff demands trial by jury.

### COUNT III
### EMPLOYMENT DISCRIMINATION BASED UPON DISABILITY IN VIOLATION OF 29 U.S.C. § 794(a) – TERMINATION

101.     Plaintiff incorporates and realleges paragraphs 1-100 as though fully stated herein.

16

102.     The Act, through its incorporation of 42 U.S.C.A. § 12112 of the Americans with Disabilities Act, prohibits termination of a qualified individual on the basis of disability.

103.     Upon information and belief, Cho made the determination to terminate Plaintiff.

104.     Upon information and belief, Rutkoske was involved in making the determination to terminate Plaintiff.

105.     Upon information and belief, Defendant decided in around January of 2023 that it was going to eventually terminate Plaintiff. This was around 90 days into Plaintiff's employment with Defendant, when Plaintiff finally started to be trained on the essential functions of his position, and when Plaintiff requested his reasonable accommodation employer.

106.     Defendant demonstrated its intent to terminate Plaintiff throughout February of 2023 and early March of 2023 in the following ways:

a.  Failing to provide Plaintiff with a complete Performance Plan, in violation of Defendant's own policies and procedures;

b.  Failing to train Plaintiff on the essential functions of his position, in order to set him up for failure;

c.  Implementing weekly meetings with the intent of documenting Plaintiff's alleged inability to perform job duties on which Defendant had not trained Plaintiff. In other words, Defendant withheld training from Plaintiff, and then wrote Plaintiff up for allegedly not knowing how to do his job;

d.  Failing to provide Plaintiff with timely feedback regarding his performance, both in and out of weekly meetings, as required by Defendant's own policies and procedures;

e.  Failing to fully train Plaintiff on the procedures for administering pre-oath briefings and pre-accession interview sheets;

f.  Knowingly concealing Plaintiff's alleged errors regarding the February 21, 2023 incident; and,

g.  Blaming Plaintiff for errors which occurred because Defendant had failed to train him on the tasks at issue.

107.  Defendant terminated Plaintiff as a result of his disability. As discussed above, Cho, Burke, and other supervisors and managers of Plaintiff were biased against Plaintiff because of his disability. This was demonstrated by their neglect, disdain, impatience, and annoyance in communicating with Plaintiff and answering his questions. This was also demonstrated by the fact of their discriminatory attitude towards Plaintiff when he tried to use his reasonable accommodation recorder. They simply did not want to work with an employee with a disability.

108.  Defendant's stated reasons for termination in the March 8, 2023 letter were pretextual:

a.  Cho improperly cited the February 8, 15, and 22 weekly meetings as examples of Plaintiff failing to perform the essential functions of his job.

i.  Defendant had implemented those meetings with the improper purpose of writing Plaintiff up for areas in which Defendant had failed to train Plaintiff;

18

      ii. In any event, Plaintiff had already demonstrated substantial improvement in nearly all of the areas discussed in the weekly meetings by the March 2, 2023 meeting;

b. Cho improperly cited to the February 14, 2023 incident as an example of Plaintiff failing to perform the essential functions of his job.

      i. Defendant had not trained Plaintiff on the procedures for pre-oath briefings and pre-accession interview sheets, or properly included them in a Performance Plan.

      ii. In any event, Plaintiff immediately corrected the error on February 14, 2023 and never repeated the same error;

c. Cho improperly cited to the February 21, 2023 incident as an example of Plaintiff failing to perform the essential functions of his job.

      i. Defendant had not fully trained Plaintiff on how to use MIRS 1.1 in this manner. Defendant did not include MIRS 1.1 in any of the weekly meetings, and had not properly included MIRS 1.1 in a Performance Plan.

      ii. Defendant did not even inform Plaintiff of this alleged error prior to his termination.

      iii. The February 21, 2023 error occurred primarily due to an issue with the MIRS 1.1 software and not through any error by Plaintiff.

      iv. In any event, the same error never occurred at any time again during Plaintiff's use of the MIRS 1.1 system.

d. In other words, the reasons cited by Cho for termination were: the result of Defendant's failure to train Plaintiff, issues that Plaintiff had already resolved

or not repeated, or areas that Plaintiff was already starting to improve. None of them were examples of Plaintiff's actual inability to perform the essential functions of the position.

109. Upon information and belief, Defendant did not subject similarly situated employees without Asperger's Syndrome to the above conduct, or terminate them in the same manner.

110. Defendant's termination of Plaintiff was thus discrimination against a qualified individual on the basis of her actual or perceived disability, in violation of the Act.

111. In terminating Plaintiff, Defendant maliciously and/or recklessly violated the Act.

112. Plaintiff demands trial by jury.

**WHEREFORE**, Plaintiff, BLAKE O'DELL respectfully prays that this Honorable Court:

1. Enter a declaratory judgment that the practices complained of herein are unlawful and violative of Rehabilitation Act;

2. Permanently enjoin Defendant, its agents, successors, officers, employees, attorneys and those acting in concert with it or them from engaging in each of the unlawful practices, policies, customs and usages set forth herein, and from continuing any and all practices shown to be in violation of applicable law;

3. Order modification or elimination of the practices, policies, customs and usages set forth herein and all other such practices shown to be in violation of applicable law so that they will not discriminate on the basis of gender;

4. Order that Defendant reinstate Plaintiff into another Schedule A eligible position with Defendant in the Chicago Area;

20

5.  Order that any probationary period that Plaintiff be subjected to be counted from the date of his initial hiring, on October 11, 2022;

6.  If Plaintiff is reinstated with Chicago MEPS, that he be re-assigned to another supervisor, department, and commanding officer than those who previously supervised him;

7.  Order Defendant to rescind and remove the March 8, 2023 termination letter from his record;

8.  Order Defendant to work with Plaintiff to develop an Employee Performance Plan in compliance with the requirements of DPMAP;

9.  Order that Defendant compensate and make Plaintiff whole for all earnings, wages, including prejudgment interest and other benefits that he would have received but for the discriminatory practices of Defendant;

10. Award Plaintiff the costs and disbursements of this action, including reasonable attorney's fees;

11. Award Plaintiff compensatory damages for the injuries that he has sustained;

12. Award Plaintiff punitive damages for Defendant's willful conduct; and

13. MEPS Agency cease and desist order reporting negative security background information or implying negative information about the Plaintiff.

14. Restoration of continuous time in service, no break in service time within 30 days of this Order.

15. Plaintiff is requesting Chicago MEPS issue him a Fully Successful rating of record Performance Appraisal for October 11, 2023 to March 31, 2023 and April 1, 2023 to Nov 30, 2023, i.e., for two Performance Appraisal Cycles within DoD.

16. Grant such other relief as may be just and proper.

Respectfully submitted,

By:  /s/ Henderson M. Banks
Henderson M. Banks
One of Plaintiff's attorneys

Henderson M. Banks
**Henderson Banks Law**
77 W. Wacker Drive., Floor 45
Chicago, Illinois 60601
(773) 383-3289
hbanks@hendersonbankslaw.com